

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-28-2003

# Hamilton v. Leavy

Precedential or Non-Precedential: Precedential

Docket 01-3062

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Hamilton v. Leavy" (2003). *2003 Decisions.* Paper 764.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/764

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed February 28, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3062

JEROME HAMILTON,

v.

FAITH LEAVY; PAMELA FAULKNER; WILLIAM QUEENER;
FRANCES LEWIS; GEORGE DIXON; JACK STEPHENSON;
DEBORAH CRAIG; JOANNE SMITH; DENNIS LOEBE;
ELDORA TILLERY; FRANCIS COCKROFT; JERRY BORGA;
RICHARD SHOCKLEY,

Appellants

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 94-cv-00336)
District Judge: Honorable Gregory M. Sleet

Argued April 18, 2002

Before: NYGAARD, AMBRO, Circuit Judges
and O'NEILL,* District Judge

(Opinion filed: February 28, 2003)

_____

* The honorable Thomas N. O'Neill, United States District Court Judge
for the Eastern District of Pennsylvania, sitting by designation.

Marc P. Niedzielski, Esquire (Argued)
Stuart B. Drowos, Esquire
Department of Justice
820 North French Street
Wilmington, DE 19801

Attorneys for Appellants

John W. Shaw, Esquire (Argued)
Young, Conaway, Stargatt & Taylor
P.O. Box 391, 1000 West Street
Brandywine Building, 17th Floor
Wilmington, DE 19801-0391

Attorney for Appellee

OPINION OF THE COURT

AMBRO, Circuit Judge:

This 42 U.S.C. S 1983 case is before us on interlocutory
appeal. The defendants, members of the Gander Hill Prison

Multi-Disciplinary Team ("MDT") and the Delaware Department of Corrections Central Institutional Classification Committee ("CICC"), challenge the District Court's denial of their summary judgment motion for absolute or qualified immunity from Delaware prisoner Jerome Hamilton's lawsuit alleging violations of the Eighth Amendment. The defendants contend that they are entitled to absolute immunity because they acted pursuant to a court order or otherwise in a quasi-judicial capacity. Alternatively, they argue that they should receive qualified immunity because they did not violate Hamilton's Eighth Amendment rights or because their actions were objectively reasonable. We agree with the District Court that on this record the defendants are not absolutely immune on the ground that they acted pursuant to a court order. We remand, however, for the District Court to analyze under the legal tests noted below whether the defendants are entitled either to absolute immunity for acting in a quasi-judicial capacity or to qualified immunity.

2

FACTS1

On August 5, 1992, Hamilton's cellmate in Delaware's Gander Hill prison attacked and injured him.2 Hamilton alleges that his cellmate was able to commit this assault because the defendant prison officials acted with deliberate indifference to his safety.

Hamilton has been the victim of numerous attacks from other inmates throughout his lengthy stint in the Delaware prison system, some of which we described in a prior appeal in this case. See Hamilton v. Leavy, 117 F.3d 742, 744-45 (3d Cir. 1997) (Hamilton I). For Hamilton's safety, prison officials have transferred him among various prisons both in and outside Delaware and have placed him in protective custody.

In 1986 Hamilton cooperated with a drug trafficking investigation at the Gander Hill prison that ended with the arrest of prison officials and inmates. He became known as a "snitch" and, as a result, prison officials repeatedly had to place him in protective custody. In 1990 prison officials transferred Hamilton to a Virginia prison "[b]ecause there appeared to be no safe place for Hamilton in the Delaware prisons." Id. at 745.

After the move to Virginia, however, Hamilton initiated two civil lawsuits in Delaware state courts, and he was returned in December 1991 to the Gander Hill prison to enable him to prosecute those actions effectively. He brought one of the lawsuits against state officials. Deputy Attorney General John Polk defended that case. Judge Clarence Taylor of the Delaware Superior Court, who

_____

1. The District Court ruled on the defendants' motion for summary judgment and so viewed the facts in the light most favorable to

Hamilton, the non-moving party. As we explain below, we do not have jurisdiction to review the District Court's fact-finding in this case. We therefore rely upon its opinion to lay out the facts upon which we rule, as well as our prior opinion in Hamilton v. Leavy, 117 F.3d 742 (3d Cir. 1997), to which the District Court referred readers for further factual background.

2. We follow the practice of the parties and the District Court by referring to the prison by its colloquial name, Gander Hill; its official title is the Multi-Purpose Criminal Justice Facility.

3

presided over the case, held a hearing on December 13, 1991, and addressed the question where Hamilton could be housed while discovery took place.

Deputy A.G. Polk suggested to the Court that Hamilton be kept in Delaware for a "month or so." When Judge Taylor expressed concern that the Delaware prison system be able to take the "special precautions" necessary for Hamilton, Polk volunteered to check with the appropriate officials whether this was possible, and the Court granted a recess for him to do so. After the recess, Polk informed the Court that an official from the Delaware Department of Corrections Compact had "reiterated to [him] that Mr. Hamilton is in need of protective custody," but that the Department could "accommodate" Hamilton for two months at either Gander Hill or the Sussex Correctional Institution. Polk then stated that he had requested that the Department keep Hamilton at Gander Hill.3

_____

3. The exchange went as follows:

> The Court: . . . [O]n your suggestion that he be kept here in Delaware for the next month or so, I think that ought to be cleared with the prison people because it involves special precautions . . . , whether they are in a position to maintain those-- that precaution during the period you're talking about.
>
> Deputy A.G.: I would undertake that task of clearing it with the Department, Your Honor.
>
>  . . .
>
> The Court: . . . [I]f it doesn't pose a problem to the prison administration for him to be detained up here for a month or longer in order for him to have access to the lawbooks and get out his discovery and so on while he's up here, then that would seem like the best solution to move this case forward from where it is today. . . .
>
> [Recess held to allow the Deputy A.G. to check with prison officials regarding housing Hamilton in Delaware.]
>
> Deputy A.G.: Your Honor, I've called the deputy administrator for the Delaware Department of Corrections Compact and they've indicated that a one to two-month stay by Mr. Hamilton in Delaware is

something they can accommodate.

4

The Court next informed Hamilton:

> Let's leave it that way, then. So, you'll -- you are to be
> detained up here at the State Gander Hill Prison for a
> length of time up to two months, and it will be
> dependent [on] what reports I get back from the Deputy
> Attorney General, from you and what progress is made
> toward resolving this thing without further trial. .. .
> Prison will have you up to two months and during that
> time Mr. Polk will cooperate with you and try to work
> out something . . . .

The docket entry for December 13 states: "Detained at
Gander Hill up to 2 months in protective custody."

Hamilton was still at the Gander Hill prison on March 5,
1992, almost three months later, when Judge Taylor sent a
letter to the Deputy A.G.:

> At a hearing held on December 13, 1991, you were
> ordered to supply petitioner Jerome Hamilton with
> answers to petitioner's requests for admissions by
> December 27, 1991 . . . .
>
> [T]he Interstate Corrections Compact Administrator
> has contacted my office to see if the petitioner can be
> returned to the prison from which he had been
> transferred for the purpose of resolving this case.
>
> You have failed to comply with my order of December
> 13, 1991. If Gander Hill Prison needs action, then you
> should take immediate action to comply with the order
> of December 13, 1991. Until you comply with the
> Order, there is no alternative but to keep petitioner
> Hamilton at the Gander Hill facility.

---

> The Court: They can?
>
> Deputy A.G.: They can accommodate. She reiterated to me that Mr.
> Hamilton is in need of protective custody, and I said can you
> accommodate him in Delaware. She said he can be accommodated
> in Gander Hill or SCI [Sussex Correctional Institution]. My request
> of the Department -- and I don't think that there would be a
> problem in adhering to this -- is that he be housed up here in
> Gander Hill.

5

> IT IS SO ORDERED.

Later that month, Hamilton, still in the Gander Hill
prison, filed a grievance against a correctional officer there
for calling him in front of other prisoners "a good telling

mother f_____g snitcher." Witnesses confirmed this incident.
The Resident Grievance Resolution Committee, composed of
five prison officials, recommended to the Deputy Warden
that "a thorough investigation" take place because
comments that a prisoner is a "snitch" have the potential to
cause "a major disturbance and require[ ] immediate
action." The Deputy Warden concluded on June 15, 1992,
that the correctional officer did make the statement.

Three days later, the MDT -- made up of defendants
Faith Leavy, Pamela Faulkner (now Minor), and William
Queener -- reviewed Hamilton's file, summarized his
situation in a written report, and unanimously
recommended that he be placed in protective custody. After
reviewing the MDT report and recommendation, the CICC,
which had the authority to place Hamilton in protective
custody, decided on June 24, 1992, to take "no action" on
the report, which meant that Hamilton remained without
additional safety precautions in the Gander Hill general
prison population. The members of the CICC are also
defendants in this lawsuit.

A month after the "no action" decision, inmate Steven
Clayton joined the prison population at Gander Hill and
sometime before August 5, 1992, became Hamilton's
cellmate. That day, Clayton attacked Hamilton, fracturing
his jaw and sending him to the hospital, where he had two
metal plates inserted. Clayton pled guilty to the assault and
stated that he attacked Hamilton because he was "a
snitcher on inmates and officers" at Gander Hill.

Coincidentally, on the same day as the assault (August
5), Judge Haile Alford, who had taken over Hamilton's civil
case in the Delaware Superior Court when Judge Taylor
retired, wrote a letter to Hamilton, informing him:

> Judge Taylor ordered you held at Gander Hill until the
> Deputy Attorney General had attempted to resolve this
> matter with you without further trial. A review of the
> file in this case reveals that Deputy Attorney General

> John Polk, after writing to the Court anticipating a
> settlement of this claim[,] has requested a trial date
> and that a Scheduling Order in this matter has been
> entered, setting a trial date of March 31, 1993.

> The letter from the Court dated March 5, 1992, does
> not order that you are to be held at Gander Hill until
> the completion of your case. Because this case is now
> set down for trial, the conditions that caused you to be
> incarcerated at Gander Hill have changed, and there is
> no longer a reason in [this case] for you to remain at
> that specific facility.

PROCEEDINGS

Hamilton filed this S 1983 lawsuit on June 20, 1994, in

the District Court for the District of Delaware against MDT members Leavy, Faulkner, and Queener, and against Frances Lewis, chair of the CICC, alleging deliberate indifference to Hamilton's safety in violation of his Eighth Amendment right to be free of cruel and unusual punishment. The Court entered summary judgment in favor of the MDT defendants because they "were without authority to effectuate their own recommendation that Hamilton be placed in protective custody, [and therefore] they could not be found to have deliberately disregarded serious risks to his safety." Hamilton I, 117 F.3d at 748. The Court also granted summary judgment to defendant Lewis on the ground that no reasonable factfinder could find that she knew that keeping Hamilton in the Gander Hill general prison population without additional safety precautions put Hamilton in substantial risk of suffering serious harm.

Hamilton appealed, and in June 1997 our Court reversed. See id. at 744. As to the MDT defendants, we noted Hamilton's argument that the MDT could have provided him with additional protection by, for instance, putting him in administrative segregation, even if the MDT did not have the authority to place him in protective custody. See id. at 748. We concluded that the "failure of the MDT defendants to take additional steps beyond the recommendation of protective custody could be viewed by a

factfinder as the sort of deliberate indifference to inmate safety that the Constitution forbids." Id. at 749. As to defendant Lewis, we explained that she "was made aware of a substantial risk to Hamilton's safety when she reviewed the MDT's unanimous recommendation to place Hamilton in protective custody" and, accordingly, that "a factfinder could infer that Lewis knew that the threat to Hamilton's safety was imminent." Id. at 747.

Back in the District Court, Hamilton amended his complaint to add additional defendants: George Dixon, Jack Stephenson, Deborah Craig, Joanne Smith, Dennis Loebe, Eldora Tillery, Francis Cockroft, Jerry Borga, and Richard Shockley, all members of CICC when the assault occurred. On July 27, 2001, the District Court denied the defendants' second motion for summary judgment. They timely appealed.

JURISDICTION

We generally have jurisdiction to review only "final decisions" of district courts. 28 U.S.C. S 1291. A denial of summary judgment, from which the defendants appeal here, usually does not qualify as a final decision for purposes of S 1291 because, far from finally deciding the case, it is a decision to permit the litigation to continue. See Giuffre v. Bissell, 31 F.3d 1241, 1245 (3d Cir. 1994). Under the collateral order doctrine, however, we have jurisdiction to review the District Court's decision if it (1) conclusively

determines a disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment. See Mitchell v. Forsyth, 472 U.S. 511, 524-25 (1985) (citing Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)).

Pre-trial denials of absolute or qualified immunity are frequently appropriate for appellate review under the collateral order doctrine. An appeal from such a denial may conclusively determine the disputed question of the defendants' entitlement to immunity, a question that is conceptually separate from the merits of the case. See id. at 527-28. And because immunity is intended to protect the

8

defendant "from suit," id. at 526 (emphasis in original) -- not simply from an adverse judgment at the conclusion of litigation -- a grant of immunity after a final judgment "would come too late." Johnson v. Jones , 515 U.S. 304, 312 (1995).

We have jurisdiction to review a pre-trial denial of immunity under the collateral order doctrine only to the extent that it raises questions of law. See Giuffre, 31 F.3d at 1245 ("[A]n order denying qualified or absolute immunity, to the extent that the order turns on an issue of law, is immediately appealable under the collateral order doctrine.") (citation omitted). We may not review the District Court's "identification of the facts that are subject to genuine dispute," but instead we review the legal issues in light of the facts that the District Court determined had sufficient evidentiary support for summary judgment purposes. See Ziccardi v. City of Philadelphia , 288 F.3d 57, 59, 61 (3d Cir. 2002).4 And, of course, we give de novo review to those legal issues. Giuffre, 31 F.3d at 1251.

DISCUSSION

A. Absolute immunity for actions taken pursuant to a
        court order

The defendants assert that they should receive absolute immunity from Hamilton's claim that they violated the Eighth Amendment because the conduct (or lack thereof) for which they are sued was taken pursuant to a court order. As the defendants see it, the Superior Court's orders -- Judge Taylor's December 13 oral decision and docket order and his March 5 letter to the Deputy A.G.-- prohibited the defendants from moving Hamilton from the Gander Hill prison. The defendants argue that the Delaware prison system did not at that time provide for protective

---

4. The facts sufficiently proven for summary judgment purposes include those facts not subject to genuine dispute as well as those facts that are subject to such dispute, viewed in the light most favorable to Hamilton, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

custody at Gander Hill, so they could not have placed Hamilton in protective custody without violating the Superior Court's order to keep him at Gander Hill.

The defendants are correct that action taken pursuant to a facially valid court order receives absolute immunity from S 1983 lawsuits for damages. See Wolfe v. City of Pittsburgh, 140 F.3d 236, 240 (3d Cir. 1998); Richman v. Sheahan, 270 F.3d 430, 437 (7th Cir. 2001).5 The District Court so recognized but nonetheless denied the defendants' motion for absolute immunity because they had not established that they acted pursuant to a court order. The Court concluded instead that the Superior Court's orders did not prohibit the defendants from moving Hamilton from the Gander Hill prison to another facility in order to place him in protective custody and that, even if the orders had prohibited such action, they did not also prevent the defendants from otherwise providing Hamilton with effective protection at Gander Hill.

Hamilton contends, however, that the question whether the defendants acted pursuant to an order of the Superior Court is one of fact and therefore an issue we cannot address. In the end, whether a defendant is entitled to absolute immunity is a question of law, see Carver v. Foerster, 102 F.3d 96, 99 (3d Cir. 1996) ("Absolute immunity is an issue of law . . . ."); In re Montgomery County, 215 F.3d 367, 372 (3d Cir. 2000) ("Absolute immunity is a purely legal question . . . ."), but we agree with Hamilton that this ultimately legal issue can also involve factual questions.

Indeed, in Lockhart v. Hoenstine, 411 F.2d 455 (3d Cir. 1969), we treated the question whether a defendant acted pursuant to a court order -- the question presented here -- as one of fact. Id. at 460. The disputed question there concerned whether a court had issued an order to the defendant -- the court's prothonotary -- not to accept the

---

5. This type of immunity is sometimes referred to as "quasi-judicial" immunity. We reserve this moniker, however, for another form of immunity asserted by the defendants (for acting in a role that is functionally comparable to that of a judge, rather than under the authority of a court order), discussed in Section B below.

plaintiff 's papers for filing. Id. at 457-58. Here, in contrast, the key issue is not factually whether the Superior Court entered an order at all, but is instead what the Superior Court's orders mean. This is a question of law, see Apex Fountain Sales, Inc. v. Kleinfeld, 818 F.2d 1089, 1097 (3d

Cir. 1987) (The "construction of . . . [a] court order" is "a purely legal issue."), which we can review. We turn now to that question.

The defendants repeat to this Court their contention, rejected by the District Court, that the Superior Court's orders forbade them from moving Hamilton from the Gander Hill prison to another facility where he could be placed in protective custody. We agree with the District Court's conclusion.

The Superior Court's order of December 13, 1991, did not by itself prohibit moving Hamilton. To recap, on December 13 Judge Taylor agreed to the Deputy A.G.'s request that Hamilton be detained in a Delaware prison only after receiving assurances that the Delaware Department of Corrections could take the "special precautions" necessary for Hamilton's safety. It was at the Deputy A.G.'s request that the Superior Court ordered that Hamilton be kept at Gander Hill rather than at the Sussex Correctional Institution. And the December 13 docket entry states that Hamilton is to be housed at Gander Hill "up to 2 months in protective custody."

The December 13, 1991 colloquy with Judge Taylor (which in his March 5, 1992 letter he referred to as an order) did not require Hamilton's detention for more than a period of two months at Gander Hill, instead of at Sussex or another prison. But especially it cannot be interpreted to have required his detention at Gander Hill if the prison officials there became unable (or unwilling) to keep Hamilton in "protective custody" or to provide some other form of "special precautions" for his safety. Accordingly, the order did not prohibit the MDT or the CICC in the summer of 1992 (the key time period) from placing Hamilton in a facility that could provide him with protective custody.

We reach the same conclusion as to the March 5 letter. Again, that letter, addressed to Deputy A.G. Polk,

11

concluded: "Until you comply with the Order, there is no alternative but to keep petitioner Hamilton at the Gander Hill facility." This statement did not require that the defendants keep Hamilton at Gander Hill indefinitely, as they seem to argue. Instead, it explicitly states that it will operate only until the time that the Deputy A.G. complied with "the Order." Read in context, the "Order" with which the Deputy A.G. must comply refers to the Superior Court's December 13 order that the Deputy A.G. participate in discovery, communicate with Hamilton, and inform the Court of the results of this process.

Judge Alford's letter of August 5 is in accord with our understanding of the March 5 letter. She explained that "Judge Taylor ordered [Hamilton] held at Gander Hill until the Deputy Attorney General had attempted to resolve this matter with [Hamilton] without further trial." And further:

"The letter from the Court dated March 5, 1992, does not order that [Hamilton was] to be held at Gander Hill until the completion of [the civil] case." Finally, Judge Alford's letter also tells us that by August 5 the Deputy A.G. had reported to the Superior Court on the progress of the civil suit litigation and that trial had been set, putting an end to the March 5 requirement that Hamilton stay at Gander Hill.

Accordingly, neither of the Superior Court orders explains adequately the defendants' failure to remove Hamilton from Gander Hill. They are therefore not entitled to absolute immunity on this ground.

The District Court also held that the Superior Court's orders "would not have prevented the defendants from providing Hamilton with effective protection at Gander Hill" and thus, on this ground as well, the orders did not provide absolute immunity to the defendants. We again agree with the District Court.

The Tenth Circuit has addressed an analogous issue. In Turney v. O'Toole, 898 F.2d 1470 (10th Cir. 1990), also a S 1983 case, a state court ordered the seventeen-year-old plaintiff confined at a state hospital for mental health treatment. Id. at 1471. At the hospital, the plaintiff was placed in the adult maximum security unit. Id. at 1472. "When efforts to find a more suitable placement failed," the

12

plaintiff obtained a writ of habeas corpus ordering his release. Id. The plaintiff then sued the superintendent and a psychologist at the hospital, alleging violations of S 1983. The District Court granted absolute immunity to the defendants on the ground that they were acting pursuant to the court order. Id.

The Tenth Circuit reversed in part, holding that the defendants "were absolutely immune from liability arising from the fact of [the plaintiff 's] confinement, but that they were only qualifiedly immune from liability arising from the conditions in which he was held." Id. The Court explained:

> [T]his absolute immunity [for the plaintiff 's confinement] extended only to acts prescribed by[the court's] order, . . . and . . . all the order decreed was [the plaintiff 's] confinement at [the hospital]. It did not dictate any specific placement or treatment within the facility. Therefore, the defendants are not absolutely immune from liability arising from [the plaintiff 's] placement in the maximum security ward.

Id. at 1474 (citations omitted); see also Nixon v. Fitzgerald, 457 U.S. 731, 755 (1982) ("In defining the scope of an official's absolute privilege, this Court has recognized that the sphere of protected action must be related closely to the immunity's justifying purposes.").

The Superior Court's orders entered in this case did not

direct the defendants -- expressly or otherwise-- to confine Hamilton in conditions that they knew posed a substantial risk of serious harm. The Superior Court's concern that a Delaware facility take "special precautions" to ensure Hamilton's safety and the December 13 docket entry noting that Hamilton was to be kept in "protective custody" made clear that he must remain safe.

Even if the Superior Court had not stated such explicit concern for Hamilton's safety (indeed ordered that he be placed in protective custody), nothing else in the Court's orders provides a basis to interpret them as having prohibited any of the defendants from taking steps to provide Hamilton with effective protection. In accord with the Tenth Circuit's decision in Turney, we hold that the Superior Court's December 13 and March 5 orders cannot

13

immunize the defendants for their allegedly unconstitutional failure to take action to protect Hamilton.

* * *

We conclude that the defendants are not entitled to absolute immunity from Hamilton's Eighth Amendment claim on the basis of the Superior Court's orders concerning Hamilton's confinement in Delaware. We therefore affirm the District Court's decision denying the defendants' motion for summary judgment on this ground.

B. Quasi-judicial absolute immunity

The defendants also argue that they are entitled to absolute immunity because they acted in quasi-judicial capacities when, in the case of the CICC defendants, they decided to take "no action" on the MDT's recommendation that Hamilton be placed in protective custody, and when, in the case of the MDT defendants, they chose to take no steps to secure Hamilton's safety other than the recommendation they made to the CICC. The District Court, citing Cleavinger v. Saxoner, 474 U.S. 193 (1985), held that the defendants could not receive quasi-judicial absolute immunity because "this type of immunity generally does not extend to prison officials."

Quasi-judicial absolute immunity attaches when a public official's role is "functionally comparable" to that of a judge. Butz v. Economou, 438 U.S. 478, 513 (1978). To determine this, a court must consider whether the official acted independently and what procedural safeguards attended his/her decision-making process. See Cleavinger , 474 U.S. at 202. Cleavinger concerned whether members of a prison disciplinary committee could receive quasi-judicial immunity. Before holding that they could not, the Supreme Court analyzed the independence and safeguards accompanying the committee's decision-making process. Id. at 202-06. In so doing, the Court did not hold per se that prison officials can never receive quasi-judicial immunity.

Though the District Court may be correct that prison officials generally cannot receive quasi-judicial immunity, Cleavinger requires that it analyze whether the particular defendants here are entitled to that immunity. The District

14

Court did not do so. Also, we do not know what facts pertaining to the committees' independence and safeguards were sufficiently proven for summary judgment purposes.

We recently announced in Forbes v. Township of Lower Merion, 313 F.3d 144, 146 (3d Cir. 2002), a supervisory rule requiring district courts to set out what facts they relied on and the legal reasoning they used to determine whether to grant a summary judgment motion for qualified immunity. We now extend this rule to require district courts to provide the same information when deciding motions for summary judgment based on absolute immunity defenses. Accordingly, we remand to the District Court in order for it to reconsider whether the defendants are entitled to quasi-judicial absolute immunity. 6

C. Qualified immunity

Finally, the defendants contend that they are entitled to qualified immunity either because Hamilton has not raised a genuine issue of material fact whether the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment or because no clearly established law prohibited the defendants' conduct at the time they acted. The District Court rejected this claim, and we remand for further consideration of the issues.

In determining whether to grant summary judgment on qualified immunity grounds, a court must first consider whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). "[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Id.

The defendants violated Hamilton's Eighth Amendment rights only if they acted with deliberate indifference to his

---

6. On remand, if the defendants direct the Court to any evidence pertaining to the independence and safeguards of their decision-making processes (they did not do so here), it may be useful to compare this evidence with the independence and safeguards considered insufficient in Cleavinger to warrant quasi-judicial immunity.

15

safety; in other words, to be liable, the defendants must

have known that Hamilton "face[d] a substantial risk of serious harm" and they must have "disregard[ed] that risk by failing to take reasonable measures to abate it." Farmer v. Brennan, 511 U.S. 825, 847 (1994). As noted above, in Hamilton I, 117 F.3d at 745-49, we held that Hamilton had raised a genuine issue of material fact whether defendants Leavy, Faulkner, Queener, and Lewis acted with deliberate indifference to Hamilton's safety in violation of the Eighth Amendment.

The District Court's opinion did not discuss whether a constitutional violation occurred other than to note that we held in Hamilton I that a genuine issue of material fact existed as to the reasonableness of the defendants' conduct. The Court then skipped ahead to address the second prong in the qualified immunity analysis. It seems to us likely that, in so doing, the Court tacitly applied the law of the case doctrine, reasoning that Hamilton I had conclusively resolved for summary judgment purposes the first prong of the qualified immunity analysis.

The law of the case doctrine "limits relitigation of an issue once it has been decided" in an earlier stage of the same litigation. In re Continental Airlines, Inc., 279 F.3d 226, 232 (3d Cir. 2002). We apply the doctrine with the intent that it will promote finality, consistency, and judicial economy. In re City of Philadelphia Litig., 158 F.3d 711, 717-18 (3d Cir. 1998). Reconsideration of a previously decided issue may, however, be appropriate in certain circumstances, including when the record contains new evidence. Id. at 718; Bridge v. United States Parole Comm'n, 981 F.2d 97, 103 (3d Cir. 1992). This exception to the law of the case doctrine makes sense because when the record contains new evidence, "the question has not really been decided earlier and is posed for the first time." Bridge, 981 F.2d at 103. But this is so only if the new evidence differs materially from the evidence of record when the issue was first decided and if it provides less support for that decision. City of Philadelphia Litig., 158 F.3d at 720. Accordingly, if the evidence at the two stages of litigation is "substantially similar," or if the evidence at the latter stage provides more support for the decision made earlier, the law of the case doctrine will apply. Id.

16

Our decision in Hamilton I that the record evidence did not permit the entry of summary judgment in favor of the defendants in the case at that time (Leavy, Faulkner, Queener, and Lewis) does constitute the law of the case as to that evidence and those defendants. Between Hamilton I and the District Court's rejection of the qualified immunity defense, however, the parties engaged in discovery and supplemented the record. If the record now contains evidence materially deviating from the evidence in the record when we decided Hamilton I, the application of the law of the case doctrine may be inapplicable to the defendants in Hamilton I. Because of the factual nature of this determination, and because we cannot be certain that

the District Court applied the law of the case doctrine, we remand for the Court to decide in the first instance whether that doctrine applies.

Between Hamilton I and the District Court's decision, Hamilton also amended the complaint to include additional defendants. We agree with the Seventh Circuit that "[t]he law of the case doctrine should not be read so rigidly that it precludes a party from raising an argument that it had no prior opportunity to raise." United States v. Dexter, 165 F.3d 1120, 1124 (7th Cir. 1999) (quoting Bagola v. Kindt, 131 F.3d 632, 637 (7th Cir. 1997)). The defendants added since Hamilton I lacked the opportunity to argue that they had not violated Hamilton's Eighth Amendment rights. On remand, they will have the opportunity to do so. We recognize, however, that the Hamilton I decision, though "not controlling, . . . is highly persuasive authority for the issues it addressed." Id.

Turning to the second prong of the qualified immunity defense, the District Court held that "Hamilton's right to be protected from known risks was clearly established in August 5, 1992." As we have previously explained, however, "to defeat qualified immunity it is not sufficient that the right at issue be clearly established as a general matter. Rather, the question is whether a reasonable public official would know that his or her specific conduct violated clearly established rights." Grant v. City of Pittsburgh, 98 F.3d 116, 121 (3d Cir. 1996) (citing Anderson v. Creighton , 483 U.S. 635, 636-37 (1987)) (emphasis in original); Saucier, 533

17

U.S. at 202. Because we do not know what "specific conduct" the District Court on remand will consider sufficiently established for summary judgment purposes, we remand without addressing the question whether Hamilton can withstand the defendants' summary judgment motion to the extent it argues that they did not violate any clearly established law.

CONCLUSION

The District Court correctly concluded that the defendants have not established that they are entitled to absolute immunity on the ground that the Superior Court's orders prohibited them from providing Hamilton with effective safety measures. We remand, however, for the Court to reconsider whether they are entitled to quasi-judicial absolute immunity. Finally, the District Court on remand should address also the applicability of the law of the case doctrine and whether the defendants should receive qualified immunity.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit